**HER MAJESTY THE QUEEN IN RIGHT OF the PROVINCE OF BRITISH COLUMBIA, Plaintiff,**

v.

**John Raymond GILBERTSON, Leonard Rosenthal, Jack Sylvester, Frank Jay Cobbs, Claude Marian Johns, Defendants.**

Civ. No. 76–457.

United States District Court,
D. Oregon.

Jan. 20, 1977.

Donald R. Stark, Portland, Or., for plaintiff.

Miles Sweeney, Portland, Or., for defendants.

OPINION and ORDER

BURNS, District Judge:

The Magistrate, Honorable George E. Juba, filed a Recommendation and Order dismissing this case. Plaintiff, pursuant to 28 U.S.C. § 636(b)(1)(C), moved for a review. The matter was orally argued. I have now had time to study and reflect upon the matter. I am satisfied that Judge Juba's opinion is both legally correct and is an excellent exposition of the issues.[1] Accordingly,

It is ORDERED that this action is dismissed.

RECOMMENDATION AND ORDER

Plaintiff brings this action to recover $195,929.50 (Canadian) on a tax judgment obtained against the defendants in British Columbia on July 9, 1975. Jurisdiction is based on 28 U.S.C. § 1332(a)(2).

---

1. For opposing views of the subject, see Note, The Enforcement of Foreign Non-Criminal Penal and Revenue Judgments in England and the U.S., 16 International and Comparative Law Quarterly 663 and Recent Case Note, 77 Harvard Law Review 1327.

Defendants, all citizens of Oregon, received income subject to taxation under Chapter 225 of the Laws of British Columbia (Logging Tax Act). Under the provisions of the Act, the defendants were originally charged with a $210,600.00 tax assessment. Defendants appealed, and this assessment was reduced to $173,252 as of November 28, 1973.

A "Notice of Intention to Enforce Payment" was subsequently served on defendants in the United States. Thereafter, a certificate of assessment was filed in the Vancouver Registry of the Supreme Court of British Columbia. The amount stated in this certificate was $195,929.50, including penalty and interest for the period November 28, 1973, to June 30, 1975. Under the law of British Columbia, the filing of this certificate has the same force and effect as a judgment of the court.

Although defendants moved to dismiss on several grounds, the parties have limited the issue for purposes of argument to whether Oregon will enforce a judgment for taxes rendered by the Province of British Columbia.

The issue is one of first impression. Apparently this is the first time in American legal history that a foreign government has sought enforcement of a tax judgment in a court of the United States. The best explanation for this seems to be that the "well established rule" that it cannot be done has deterred all attempts. *Government of India, Ministry of Finance v. Taylor,* [1955] A.C. 491, 514–15. *See, Newcomb v. Commissioner of Internal Revenue,* 23 T.C. 954 (1955).

This "well established rule" seems to have originated in Lord Mansfield's dictum that "no country ever takes notice of the revenue laws of another." *Holman v. Johnson,* 1 Cowp. 341, 343, 98 Eng.Rep. 1120, 1121 (1775). This "precedent" has been followed in all of the Commonwealth nations, and in *this* country, it was used by the court of one state to refuse to enforce tax assessments of sister states. *See, State of Maryland v. Turner,* 75 Misc. 9, 132 N.Y.S. 173 (Sup.Ct.1911); *Colorado v. Harbeck,* 232 N.Y. 71, 133 N.E. 357 (1921).

Judge Learned Hand gave a rationalization for this rule in *Moore v. Mitchell,* 28 F.2d 997 (D.N.Y.1928), *aff'd,* 30 F.2d 600 (2d Cir. 1929), *aff'd on other grounds,* 281 U.S. 18, 50 S.Ct. 175, 74 L.Ed. 673 (1930). In *Moore,* the issue before the court was whether to maintain an action in New York to recover delinquent taxes due in Indiana. The complaint was dismissed. Judge Hand compared the revenue rule to the rule that a foreign state will not enforce the penal laws of another state:

> While the origin of the exception in the case of penal liabilities does not appear in the books, a sound basis for it exists, in my judgment, which includes liabilities for taxes as well. Even in the case of ordinary municipal liabilities, a court will not recognize those arising in a foreign state, if they run counter to the "settled public policy" of its own. Thus a *scrutiny of the liability is necessarily always in reserve, and the possibility that it will be found not to accord with the policy of the domestic state.* This is not a troublesome or delicate inquiry when the question arises between private persons, but it takes on quite another face when it concerns the relations between the foreign state and its own citizens or even those who may be temporarily within its borders. *To pass upon the provisions for the public order of another state is, or at any rate should be beyond the powers of a court; it involves the relations between the states themselves, with which courts are incompetent to deal, and which are intrusted to other authorities. It may commit the domestic state to a position which would seriously embarrass its neighbor.* Revenue laws fall within the same reasoning; they affect a state in matters as vital to its existence as its criminal laws. No court ought to undertake an inquiry which it cannot prosecute without determining whether those laws are consonant with its own notions of what is proper. 30 F.2d at 604 (emphasis added).

Judge Hand's rationalization is no longer applicable to an action involving sister states because such actions are now enforced through the full faith and credit clause. *See, Milwaukee County v. M. E. White & Co.,* 296 U.S. 268, 56 S.Ct. 229, 80 L.Ed. 220 (1935). However, it is still eminently applicable to such actions between nations. Selectively refusing to enforce a specific tax suit for reasons of public policy might well be taken as an affront to the taxing foreign government, even if it were not so intended. This could put the United States in an embarrassing position and upset the sometimes delicate relationship between the United States and other nations. In my opinion, the courts should not make this selection process; thus, it is better to entertain no suits at all. The proper place to make such policy decisions is located elsewhere in the government through the use of treaties. *See, Zschernig v. Miller,* 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968); 77 *Harv.L.Rev.* 1327 (1963). Further, although I am asked to decide what Oregon would do in this specific case under the doctrine of *Erie R. R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), I note that the United States Senate has gone on record of disapproving federal collection of foreign taxes.[1]

Turning now to Oregon law, I find nothing that would indicate this suit should be permitted to continue. There is an indication that the Oregon Legislature considers reciprocity important. For example, ORS 305.610 provides in part:

> *Reciprocal Recognition of tax liability; actions in other states for Oregon taxes.* (1) The courts of Oregon shall recognize and enforce the liability for taxes lawfully imposed by the laws of any other state which extends a like comity in respect of the liability for taxes lawfully imposed by the laws of this state.

While the above statute applies only to sister states, ORS 118.810 applies a similar provision to the enforcement of foreign death taxes and specifically includes foreign nations as well. ORS 118.810(3). If reci-

procity were the proper test, plaintiff's action would fare badly. In *United States of America v. Harden,* 41 D.L.R.2d 721 (1963), the Supreme Court of Canada refused to enforce the government's suit on a judgment for income tax liability against a citizen of British Columbia. A federal court in California had entered a stipulated judgment against the British Columbia citizen for income tax indebtedness in the amount of some $600,000. The government sought to enforce the judgment in British Columbia. The Supreme Court of Canada, in affirming dismissal of the action, noted the "well established rule" that precluded a foreign state from suing for taxes in Canada. The Court added that it made no difference whether it was characterized as a tax claim, a judgment, or an agreement—supported by consideration—to pay a sum of money; in substance, it was still a suit for taxes which would be rejected. The court summarized its position by quoting:

> "For the purpose of this case it is sufficient to say that when it appears to the court that the whole object of the suit is to collect tax for a foreign revenue, and that this will be the sole result of a decision in favour of the plaintiff, then a court is entitled to reject the claim by refusing jurisdiction." 41 D.L.R.2d at 726–27, *quoting* Kingsmill Moore, J., in *Peter Buchanan, Ld. & Marcharg v. McVey* [1955] A.C. 516, 529 (1950).

Plaintiff contends that *Harden* is no authority for the proposition that British Columbia would refuse to enforce an Oregon tax judgment because *Harden* involved a California judgment. I do not agree. The Supreme Court in *Harden* did not even consider reciprocity; it firmly adhered to the "well established rule." This indicates to me that British Columbia would not enforce Oregon tax judgments even if Oregon were to entertain the present suit.

Plaintiff further contends that allowing a taxpayer to escape taxation in a foreign country by removing himself and his property from that nation is unfair; that the

---

1. 97 Cong.Rec. 11434 (1951) (remarks of Senator George).

income tax laws of British Columbia are not contrary to Oregon's public policy; and that it would be in Oregon's best interest to try to break the never-ending circle with respect to reciprocity. I agree with plaintiff's contentions. However, as I have stated, these are the considerations with which the courts should not deal in a selective, piecemeal manner. Such considerations are better left to the legislative and executive branches of the government.

Accordingly, this action should be dismissed.

Dated this 20th day of January, 1977.
(s) George E. Juba
United States Magistrate